McGREGOR W. SCOTT
United States Attorney
ANDRÉ M. ESPINOSA
KEVIN KHASIGIAN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

**FILED**

DEC 1 2 2019

CLERK, U.S DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

          Plaintiff,

          v.

ROBERT A. KARMANN,

          Defendants.

CASE NO. 2:19 CR 222 - MCE

18 U.S.C. § 371 – Conspiracy To Commit An Offense Against The United States and to Defraud The United States; 15 U.S.C. §§ 77(q)(a) and 77x – Securities Fraud (2 Counts)

# INFORMATION

COUNT ONE: [18 U.S.C. § 371 – Conspiracy to Commit an Offense Against the United States and to Defraud the United States]

The United States Attorney charges: T H A T

ROBERT A. KARMANN,

defendants herein,

## I. Background

At all times relevant to this Information,

1.     Company S, headquartered in Benicia, California, in the State and Eastern District of California, was a solar energy device manufacturing and sales corporation that primarily solicited investors to participate in transactions organized around the manufacture and deployment in the market of mobile solar generator units.

INFORMATION     1

2. Company D, headquartered in Benicia, California, in the State and Eastern District of California, was a separate corporation but closely related to Company S, and primarily responsible for managing certain equipment sold in transactions closed by Company S.

3. Although they were separate legal entities, which carried separate accounting and tax obligations, Company S and Company D shared common employees and facilities, relied on common leadership, and operated in material respects as a single entity (collectively the "Company").

4. Individual 1 was a resident of Martinez, California, the owner and operator of Company S, and the Chief Executive Officer of the Company.

5. Individual 2 was a resident of Martinez, California, the owner and operator of Company D, and the Chief Operations Officer of the Company.

6. Individual 3 was a resident of Lafayette, California, and an attorney licensed to practice law in California. Individual 3 was outside counsel to the Company, and provided legal and business advice concerning the Company's operations. Individual 3 began working with the Company in approximately April 2011.

7. Defendant ROBERT A. KARMANN was a resident of Clayton, California, and the Chief Financial Officer for the Company. Defendant ROBERT A. KARMANN began working for the Company in approximately August 2014.

8. Individual 5 was a resident of Pleasant Hill, California, and the Vice President of Operations for the Company. Individual 5 began working for the Company in approximately May 2012.

9. Co-conspirator Ronald J. Roach, charged elsewhere, was a resident of Walnut Creek, California, and a certified public accountant licensed in California. Co-conspirator Ronald J. Roach maintained an accounting practice between 2003 and 2018 and began performing significant work for the Company as early as the end of 2011. Among other things, co-conspirator Ronald J. Roach prepared complied annual financial statements for Company D for 2011 through 2017.

10. Co-conspirator Joseph W. Bayliss, charged elsewhere, was a resident of Martinez, California, a general contractor and electrician licensed in California, and the owner and operator of Bayliss Innovative Services, Inc., a contracting services company. Co-conspirator Joseph W. Bayliss began performing work for the Company in late 2013.

## II. The Conspiracy

11. Beginning at a time no later than in or about March 2011, and continuing through in or around January 1, 2019, in the County of Solano, State and Eastern District of California, and elsewhere, defendant ROBERT A. KARMANN did knowingly and intentionally combine, agree, and conspire with Roach, Bayliss, Individuals 1, 2, 3, and 5, and others known and unknown to the United States, to commit an offense against the United States, that is, wire fraud in violation of Title 18, United States Code, Section 1343, and to use deceitful and dishonest means to defraud the United States, including the Internal Revenue Service, of and concerning its governmental functions.

## III. Manner and Means

12. In furtherance of the conspiracy, defendant ROBERT A. KARMANN and his co-conspirators employed the following ways and means, among others:

13. Directly and through subcontractors, the Company built and purported to build mobile solar generators ("MSGs"). The MSGs, when actually built, consisted primarily of solar panels placed on a wheeled-trailer that harvested and stored solar energy for later use by customers including at such locations as concert venues, and construction sites, in remote areas and elsewhere.

14. Company S, including through the sales efforts of Individual 1 and others, sold MSGs in multi-unit packages to investors through special purpose investor funds created specifically for such transactions. These investment funds, sometimes called tax-equity funds ("Funds"), were permitted under the federal tax code and purchased the MSGs with a combination of a cash payment and a long-term promissory note payable to Company S.

15. As part of the transactions, Company D leased those MSGs from the Funds and purported to lease the MSGs to third parties to generate revenue. In fact, the conspirators were often unable to lease the MSGs to third parties, contrary to representations of the conspirators and others acting at their directions that the market for MSGs was robust.

16. To encourage investors to purchase MSGs from the Company and to avoid detection of the scheme as it progressed, Individual 1 and other co-conspirators made material representations to investors, through oral statements and written materials, including that (1) the MSGs would be built and/or existed in quantities and conditions of operability consistent with the representations of the

conspirators; (2) Company D had leased and could lease the MSGs to third parties pursuant to written lease agreements; (3) there was a substantial market for the MSG leases; and (4) the transactions involving the MSGs and the Funds were structured in such a way that would allow the investors to lawfully claim tax credits and other tax benefits related to the MSGs.

17. In fact, those statements were materially false in that (1) the MSGs were not built in the quantities represented and did not exist in the quantities and the conditions of operability represented; (2) Company D had not leased and could not lease the MSGs in the quantities or on the terms represented; (3) the market for MSG leases was significantly less than represented; and (4) the transactions were not executed in a such a way that they could lawfully qualify for tax credits and other tax benefits, in part, because the MSGs that formed the basis of the transactions often did not exist and/or were not being used consistent with the representations made by the conspirators.

18. To support the false claims made to investors and to avoid detection of the scheme, the conspirators took steps including materially falsifying Commissioning Reports and other records related to the MSGs and replacing Vehicle Identification Numbers ("VIN") on MSGs to make it appear that more MSGs had been built than had actually been constructed. In some instances, the conspirators sold and/or attempted to sell the same MSGs to more than one Fund, switching the VIN numbers on existing MSGs to defeat investor inspections.

19. To further conceal the ongoing scheme and to encourage additional investments, the conspirators also created the appearance of revenue from MSG leases by operating a Ponzi-type scheme. Conspirators transferred investor money through entities they controlled to create the appearance that Company D was collecting substantial amounts of third-party lease revenue from the MSGs that Company D was then using to pay the Funds, which the Funds, in turn, paid Company S to service the Funds' promissory notes. In reality, approximately 94% or more of company D's purported MSG lease revenue came from money stolen from investors.

20. To further the ongoing fraud and to avoid detection of the scheme, the conspirators agreed to conceal the true financial structure of the Company and the true nature and extent of third-party MSG leases from current and prospective investors through materially false representations and supporting documents. Among other means, the conspirators agreed to prepare and disseminate false

compiled annual financial statements, which falsely represented that Company D had earned revenue in sufficient amounts to support its obligations under its master lease with the Funds. The conspirators completed those false financial statements knowing they would be shared with investors and intending investors to rely on the false misrepresentations they contained.

21. Between at least as early as March 2011 and December 18, 2019, at least twelve investors entered into transactions with the Company through approximately thirty-four Funds. Some investors invested through more than one Fund. The investors, through the Funds, collectively deposited by interstate wire transfer approximately $759,000,000 into bank accounts for the Funds established for the transactions. Further, several financial institutions and other investors transferred collectively $136,000,000 to the Company as part of related transactions for the purchase and lease of MSGs. In total, the Company closed transactions with Funds and other investors purportedly involving approximately 17,000 MSGs, at approximately $2.5 billion in purported value.

22. It was part of the scheme that, based on the conspirators' material misrepresentations, the investors would pursue, through the Funds, tax benefits from the Internal Revenue Service to which they were not entitled because of the false nature of the claimed revenue supporting the transactions. Many investors pursued those tax benefits, and claimed tax credits and depreciation in connection with the transactions premised on the revenue allegedly generated by Company D. The tax value of the tax credits and depreciation claimed by the Funds, up to and including the 2017 tax year, is approximately $902,000,000. This figure does not account for approximately $167,000,000 that investors paid into tax equity transactions in 2018.

### IV.   Overt Acts

23. On or about April 21, 2015, co-conspirator Ronald J. Roach prepared a compiled 2014 financial statement for Company D, which falsely represented that Company D earned more than approximately $14,234,000 in rental income.

24. On or about November 18, 2015, defendant ROBERT A. KARMANN delivered by email complied financial statements for Company D to a representative of investors in Fund 6 and Fund 12, which falsely represented the amount of third-party lease revenue Company D earned during 2014.

25. On or about February 23, 2016, defendant ROBERT A. KARMANN delivered by email

written operation reports to investors in Fund 12, which falsely represented that MSGs sold to Fund 12 were leased to a third-party entity and earning income from that third-party entity during the second, third, and fourth quarters of 2015.

26. On or about February 25, 2016, defendant ROBERT A. KARMANN delivered by email written operation reports and summaries of mobile facilities to investors in Fund 6, which falsely represented that MSGs sold to Fund 6 were leased to a third-party entity and earning income from that third-party entity during the second, third, and fourth quarters of 2015.

27. On or about May 3, 2016, co-conspirator Ronald J. Roach prepared a compiled 2015 financial statement for Company D, which falsely represented that Company D earned more than approximately $29,845,000 in rental income.

28. On or about May 12, 2016, defendant ROBERT A. KARMANN delivered by email to investors in Fund 6 and Fund 12 a written summary, which falsely represented that MSGs sold to Fund 6 and Fund 12, and leased to third-party entities, earned sufficient leases revenue in 2015 to support payment of a profit to investors in Fund 6 and Fund 12.

29. On or about May 13, 2016, defendant ROBERT A. KARMANN delivered by email a written operation report and summary of mobile facilities to investors in Fund 6, which falsely represented that MSGs sold to Fund 6 were leased to a third-party entity and earning income from that third-party entity during the first quarter of 2016. In the same email, defendant ROBERT A. KARMANN also delivered a written operation report to investors in Fund 12, which falsely represented that MSGs sold to Fund 12 were leased to a third-party entity and earning income from that third-party entity during the first quarter of 2016.

30. On or about May 10, 2017, co-conspirator Ronald J. Roach prepared a compiled 2016 financial statement for Company D, which falsely represented that Company D earned more than approximately $58,390,000 in rental income.

31. On or about July 18, 2017, co-conspirator Ronald J. Roach, acting at the direction of Individual 1, delivered by email documents to an A Group executive, to which were attached financial statements for Company D for 2014 through 2016, and an aging report that purported to set forth payment history for MSG rentals by Telecom Company A pursuant to a fixed-term lease contract

purportedly between Telecom Company A and Company D.

32. On or about July 21, 2017, Individual 5 delivered by email to Individual 1 an estoppel agreement to be delivered to A Group/K Bank, in support of that transaction, which purported to assign to A Group/K Bank third-party lease revenue for MSG rentals by Telecom Company A pursuant to a fixed-term lease contract purportedly between Telecom Company A and Company D.

33. On or about June 27, 2017, co-conspirator Joseph W. Bayliss completed and signed Commissioning Reports for MSGs associated with Fund 30, which involved approximately 1,326 MSGs.

All in violation of Title 18, United States Code, Section 371.

COUNT TWO: [15 U.S.C. §§ 77q(a) and 77x – Securities Fraud]

The United States Attorney charges: T H A T

ROBERT A. KARMANN,

defendant herein, on or about February 23, 2016, in the state and Eastern District of California, and elsewhere, did offer and sell securities, namely investment products in the form of tax-equity and sale-leaseback products, among others, sponsored by the Company; in the offer and sale of these securities, did make use of means and instruments of transportation and communication in interstate commerce and made use of the United States mails; and in the offer and sale of these securities, did willfully and knowingly and deliberately

    (a)    employ a device, scheme and artifice to defraud;

    (b)    obtain money by means of untrue statements of material facts and omit statements of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    (c)    engage in a transaction, practice and course of business that operated and would operate as a fraud and deceit upon the purchasers.

All in violation of Title 15, United States Code, Sections 77q(a) and 77x, and Title 18, United States Code, Section 2.

COUNT THREE: [15 U.S.C. §§ 77q(a) and 77x – Securities Fraud]

The United States Attorney charges: T H A T

INFORMATION 7

ROBERT A. KARMANN,

defendant herein, on about February 25, 2016, in the state and Eastern District of California, and elsewhere, did offer and sell securities, namely investment products in the form of tax-equity and sale-leaseback products, among others, sponsored by the Company; in the offer and sale of these securities, did make use of means and instruments of transportation and communication in interstate commerce and made use of the United States mails; and in the offer and sale of these securities, did willfully and knowingly and deliberately

    (a)    employ a device, scheme and artifice to defraud;

    (b)    obtain money by means of untrue statements of material facts and omit statements of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    (c)    engage in a transaction, practice and course of business that operated and would operate as a fraud and deceit upon the purchasers.

All in violation of Title 15, United States Code, Sections 77q(a) and 77x, and Title 18, United States Code, Section 2.

Dated:

                      McGREGOR W. SCOTT
                      United States Attorney

By: _____
                      ANDRE M. ESPINOSA
                      Assistant United States Attorney

## United States v. Robert A. Karmann
### Penalties for Information

**Defendant**
**ROBERT A. KARMANN**

### COUNT 1:

| | |
|---|---|
| VIOLATION: | 18 U.S.C. § 371 – Conspiracy To Commit An Offense Against The United States |
| PENALTIES: | Up to 5 years' imprisonment, or fine up to $250,000, or both; Up to 2 years' supervised release; Restitution |

SPECIAL ASSESSMENT: $100 (mandatory on each count)

### COUNT 2:

| | |
|---|---|
| VIOLATION: | 15 U.S.C. §§ 77q(a) and 77x – Securities Fraud |
| PENALTIES: | Up to 5 years' imprisonment, or fine up to $250,000, or both; Up to 2 years' supervised release; Restitution |

SPECIAL ASSESSMENT: $100 (mandatory on each count)

### COUNT 3:

| | |
|---|---|
| VIOLATION: | 15 U.S.C. §§ 77q(a) and 77x – Securities Fraud |
| PENALTIES: | Up to 5 years' imprisonment, or fine up to $250,000, or both; Up to 2 years' supervised release; Restitution |

SPECIAL ASSESSMENT: $100 (mandatory on each count)