McGREGOR W. SCOTT
United States Attorney
ANDRÉ M. ESPINOSA
KEVIN KHASIGIAN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

**FILED**

DEC 1 7 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT A. KARMANN,<br><br>Defendant. | CASE NO.  19-222 JAM<br><br>PLEA AGREEMENT<br><br>DATE:   DECEMBER 17, 2019<br>TIME:    9:15AM<br>COURT:  HON. JOHN A. MENDEZ |

## I.     INTRODUCTION

### A.     Scope of Agreement.

The Information in this case charges the defendant with violations of Title 18, United States Code, Section 371—Conspiracy to Commit an Offense Against the United States and to Defraud the United States ("Count One"), and Title 15, United States Code, Sections 77q(a) and 77x—Securities Fraud ("Counts Two and Three"). This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case. This Plea Agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

### B.     Court Not a Party.

The Court is not a party to this Plea Agreement. Sentencing is a matter solely within the

PLEA AGREEMENT                                    1

discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of the defendant, including activities which may not have been charged in the Information.  The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this Plea Agreement.

If the Court should impose any sentence up to the maximum established by the statutes, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this Plea Agreement.  The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.       DEFENDANT'S OBLIGATIONS

### A.       Guilty Plea.

The defendant will plead guilty to violating Title 18, United States Code, Section 371— Conspiracy to Commit an Offense Against the United States and Conspiracy to Defraud the United States ("Count One"), and Title 15, United States Code, Sections 77q(a) and 77x—Securities Fraud ("Counts Two and Three").  The defendant agrees that he is in fact guilty of those charges and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this Plea Agreement will be filed with the Court and become a part of the record of the case.  The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement.  The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

1.       Waiver of Indictment.

The defendant acknowledges that under the United States Constitution he is entitled to be

1 | indicted by a grand jury on the charges to which he is pleading guilty and that pursuant to Fed. R. Crim.
2 | P. 7(b) he agrees to waive any and all rights he has to being prosecuted by way of Indictment to the
3 | charges set forth in the Information. The defendant agrees that at a time set by the Court, he will sign a
4 | written waiver of prosecution by Indictment and consent to proceed by Information rather than by
5 | Indictment.

6 | **B.     Restitution.**

7 | The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of
8 | certain offenses. The defendant agrees that his conduct is governed by the Mandatory Restitution Act
9 | pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims
10 | affected by this offense, including, but not limited to, the victims covered in the factual basis, victims
11 | covered in those counts to be dismissed as part of the Plea Agreement pursuant to 18 U.S.C. §
12 | 3663A(a)(3), and other victims as a result of the defendant's conduct for the offenses charged from the
13 | periods through in or about November 2015 and in or about December 2018. The amount of restitution
14 | has not yet been determined but will likely be between approximately $600 million and $1 billion.

15 | Restitution payments shall be by cashier's or certified check made payable to the Clerk of the
16 | Court.

17 | The defendant further agrees that he will not seek to discharge any restitution obligation or any
18 | part of such obligation in any bankruptcy proceeding.

19 | **C.     Fine.**

20 | The defendant reserves the right to argue to Probation and at sentencing that he is unable to pay a
21 | fine, and that no fine should be imposed. The defendant understands that it is his burden to affirmatively
22 | prove that he is unable to pay a fine, and agrees to provide a financial statement under penalty of perjury
23 | to the Probation Officer and the government in advance of the issuance of the draft Presentence
24 | Investigation Report, along with supporting documentation. The government retains the right to oppose
25 | the waiver of a fine. If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered
26 | by the Court, up to the statutory maximum fine for the defendant's offense.

27 | **D.     Special Assessment.**

28 | The defendant agrees to pay a total special assessment of $300 (comprised of $100 per count of

PLEA AGREEMENT                          3

1  conviction) at the time of sentencing by delivering a check or money order payable to the United States
2  District Court to the United States Probation Office immediately before the sentencing hearing.  The
3  defendant understands that this Plea Agreement is voidable at the option of the government if he fails to
4  pay the assessment prior to that hearing.

5       **E.**   **Violation of Plea Agreement by Defendant/Withdrawal of Plea.**

6         If the defendant, cooperating or not, violates this Plea Agreement in any way, withdraws his
7  plea, or tries to withdraw his plea, this Plea Agreement is voidable at the option of the government.  If
8  the government elects to void the Agreement based on the defendant's violation, the government will no
9  longer be bound by its representations to the defendant concerning the limits on criminal prosecution
10  and sentencing as set forth herein.  A defendant violates this Plea Agreement by committing any crime
11  or providing or procuring any statement or testimony which is knowingly false, misleading, or
12  materially incomplete in any litigation or sentencing process in this case, or engages in any post-plea
13  conduct constituting obstruction of justice.  Varying from stipulated Guidelines application or
14  agreements regarding arguments as to 18, United States Code, section 3553, as set forth in this
15  Agreement, personally or through counsel, also constitutes a violation of the Plea Agreement.  The
16  government also shall have the right (1) to prosecute the defendant on any of the counts to which he
17  pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this Plea Agreement; and
18  (3) to file any new charges that would otherwise be barred by this Plea Agreement.  The defendant shall
19  thereafter be subject to prosecution for any federal criminal violation of which the government has
20  knowledge.  The decision to pursue any or all of these options is solely in the discretion of the United
21  States Attorney's Office.

22         By signing this Plea Agreement, the defendant agrees to waive any objections, motions, and
23  defenses that the defendant might have to the government's decision.  Any prosecutions that are not
24  time-barred by the applicable statute of limitations as of the date of this Plea Agreement may be
25  commenced in accordance with this paragraph, notwithstanding the expiration of the statute of
26  limitations between the signing of this Plea Agreement and the commencement of any such
27  prosecutions.  The defendant agrees not to raise any objections based on the passage of time with respect
28  to such counts including, but not limited to, any statutes of limitation or any objections based on the

PLEA AGREEMENT        4

1  Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-
2  barred as of the date of this Plea Agreement. The determination of whether the defendant has violated
3  the Plea Agreement will be under a probable cause standard.

4      In addition, (1) all statements made by the defendant to the government or other designated law
5  enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal,
6  whether before or after this Plea Agreement, shall be admissible in evidence in any criminal, civil, or
7  administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no
8  claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal
9  Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by
10 the defendant before or after this Plea Agreement, or any leads derived therefrom, should be suppressed.
11 By signing this Plea Agreement, the defendant waives any and all rights in the foregoing respects .

12     **F.    Asset Disclosure.**

13     The defendant agrees to make a full and complete disclosure of his assets and financial
14 condition, and will complete the United States Attorney's Office's "Authorization to Release
15 Information" and "Financial Affidavit" within twelve (12) weeks from the entry of the defendant's
16 change of plea, including supporting documentation.  The defendant also agrees to have the Court enter
17 an order to that effect.  The defendant understands that if he fails to complete truthfully and provide the
18 described documentation to the United States Attorney's office within the allotted time, he will be
19 considered in violation of the Agreement, and the government shall be entitled to the remedies set forth
20 in section II.E above, above.

21     **G.    Agreement to Cooperate.**

22     The defendant agrees to cooperate fully with the government and any other federal, state, or local
23 law enforcement agency, as directed by the government.  As used in this Plea Agreement, "cooperation"
24 requires the defendant:  (1) to respond truthfully and completely to all questions, whether in interviews,
25 in correspondence, telephone conversations, before a grand jury, or at any trial or other court
26 proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the
27 defendant's presence is requested by the government or compelled by subpoena or court order; (3) to
28 produce voluntarily any and all documents, records, or other tangible evidence requested by the

PLEA AGREEMENT                    5

1    government; (4) not to participate in any criminal activity while cooperating with the government; and
2    (5) to disclose to the government the existence and status of all money, property, or assets, of any kind,
3    derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal
4    activities or the illegal activities of any conspirators.

5    ## III.    THE GOVERNMENT'S OBLIGATIONS

6    ### A.    Dismissals/Other Charges.

7        The government agrees not to bring any other charges arising from the conduct outlined in the
8    Factual Basis attached hereto as Exhibit A.  The government also agrees not to reinstate any dismissed
9    count except if this Agreement is voided as set forth herein, or as provided in paragraphs II.E (Violation
10   of Plea Agreement by Defendant/Withdrawal of Pleas), III.B.3 (Reduction of Sentence for Cooperation),
11   VI.B (Estimated Guideline Calculation), and VII.B (Waiver of Appeal and Collateral Attack) herein.

12   ### B.    Recommendations.

13       1.    Incarceration Range.

14       The government will recommend that the defendant be sentenced to the low end of the
15   applicable guideline range as determined by the Court at sentencing.

16       2.    Acceptance of Responsibility.

17       The government will recommend a two-level reduction (if the offense level is less than 16) or a
18   three-level reduction (if the offense level reaches 16) in the computation of his offense level if the
19   defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. §
20   3E1.1.  This includes the defendant meeting with and assisting the probation officer in the preparation of
21   the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging
22   in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the
23   preparation of the pre-sentence report or during the sentencing proceeding.

24       3.    Reduction of Sentence for Cooperation.

25       The government agrees to recommend at the time of sentencing that the defendant's sentence of
26   imprisonment be reduced by up to 50% of the applicable guideline sentence if he provides substantial
27   assistance to the government, pursuant to U.S.S.G. § 5K1.1.  The defendant understands that he must
28   comply with paragraphs II.G and not violate this Plea Agreement as set forth in paragraph II.E herein.

1  The defendant understands that it is within the sole and exclusive discretion of the government to
2  determine whether the defendant has provided substantial assistance.

3      The defendant understands that the government may recommend a reduction in his sentence of
4  less than 50% or no reduction at all; depending upon the level of assistance the government determines
5  that the defendant has provided.

6      The defendant further understands that a motion pursuant to U.S.S.G. § 5K1.1 is only a
7  recommendation and is not binding on the Court, that this Plea Agreement confers no right upon the
8  defendant to require that the government make a § 5K1.1 motion, and that this Plea Agreement confers
9  no remedy upon the defendant in the event that the government declines to make a § 5K1.1 motion.  In
10  particular, the defendant agrees not to try to file a motion to withdraw his guilty plea based on the fact
11  that the government decides not to recommend a sentence reduction or recommends a sentence
12  reduction less than the defendant thinks is appropriate.

13      If the government determines that the defendant has provided further cooperation within one
14  year following sentencing, the government may move for a further reduction of his sentence pursuant to
15  Rule 35 of the Federal Rules of Criminal Procedure.

16      **C.     Use of Information for Sentencing.**

17      The government is free to provide full and accurate information to the Court and Probation,
18  including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate
19  statements or arguments by the defendant, his attorney, Probation, or the Court.  The defendant also
20  understands and agrees that nothing in this Plea Agreement bars the government from defending on
21  appeal or collateral review any sentence that the Court may impose.

22      **IV.     ELEMENTS OF THE OFFENSE**

23      The parties agree that, as charged in Count One of the Information, a person may violate 18
24  U.S.C. § 371 in more than one way, both by conspiring to (i) commit an offense against the United
25  States; and (ii) to defraud the United States.  At a trial, the government would have to prove beyond a
26  reasonable doubt the following elements of the separate violations of 18 U.S.C. § 371 to which the
27  defendant is pleading guilty.

28  ///

PLEA AGREEMENT                              7

1.    **18 U.S.C. § 371—Conspiracy to Commit an Offense Against the United States (Count One).**

Although *not* elements of Conspiracy to Commit an Offense Against the United States, in violation of 18 U.S.C. § 371, the elements of the underlying criminal offense (Wire Fraud, in violation of 18 U.S.C. § 1343) are:

a.    The defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

b.    The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

c.    The defendant acted with the intent to defraud; that is, the intent to deceive or cheat; and

d.    The defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

Thus, to convict the defendant at trial on the charge of Conspiracy to Commit an Offense Against the United States, in violation of 18 U.S.C. § 371 (Count One), the government would have to prove beyond a reasonable doubt that:

a.    Beginning at least as early as in or about March 2011, and ending in or about December 2018, there was an agreement between two or more people to commit wire fraud as charged in the Information;

b.    Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

c.    One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

2.    **18 U.S.C. § 371—Conspiracy to Defraud the United States (Count One).**

To convict the defendant at trial on the charge of Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371 (Count One), the government would have to prove beyond a reasonable doubt that:

a.    Beginning at least as early as in or about March 2011, and ending in or about December 2018, there was an agreement between two or more people to defraud the United States by obstructing the lawful functions of the Internal Revenue Service by deceitful or dishonest means as charged in the Information;

PLEA AGREEMENT                                        8

b.  Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

c.  One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

### 3.  15 U.S.C. §§ 77q(a) and 77x—Securities Fraud (Counts Two and Three).

To convict the defendant at trial on the charge of Securities Fraud, in violation of 15 U.S.C. §§ 77q(a) and 77x (Counts Two and Three), the government would have to prove beyond a reasonable doubt that:

a.  The defendant offered or sold securities as described in the Information;

b.  In the offer or sale of these securities, the defendant made use of any means or instruments of transportation or communication in interstate commerce or made use of the United States mails; and

c.  In the offer or sale of these securities, the defendant willfully, knowingly, and deliberately did at least one of the following:

   (i)   employed any device, scheme, or artifice to defraud;

   (ii)  obtained money by means of any untrue statements of material facts or omitted statements of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

   (iii) engaged in a transaction, practice, or course of business that operated or would operate as a fraud or deceit upon the purchasers.

The defendant fully understands the nature and elements of the crimes charged in the Information to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

### V.   MAXIMUM SENTENCE

### A.   Maximum Penalties.

### 1.   18 U.S.C. § 371—Conspiracy to Commit an Offense Against the United States and to Defraud the United States (Count One).

The maximum sentence that the Court can impose on Count One is 5 years of incarceration, a fine of $250,000, a 3-year period of supervised release and a special assessment of $100. By signing this Plea Agreement, the defendant also agrees that the Court can order the payment of restitution for the

PLEA AGREEMENT                                    9

1   full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is
2   not restricted to the amounts alleged in the specific count to which he is pleading guilty. The defendant
3   further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy
4   proceeding any restitution imposed by the Court.

5       **2.**    **15 U.S.C. §§ 77q(a) and 77x—Securities Fraud (Counts Two and Three).**

6       The maximum sentence that the Court can impose on each of Counts Two and Three is 5 years
7   of incarceration, a fine of $250,000, a 3-year period of supervised release and a special assessment of
8   $100. By signing this Plea Agreement, the defendant also agrees that the Court can order the payment
9   of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the
10  restitution order is not restricted to the amounts alleged in the specific count to which he is pleading
11  guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present
12  or future bankruptcy proceeding any restitution imposed by the Court.

13      **B.**    **Violations of Supervised Release.**

14      The defendant understands that if he violates a condition of supervised release at any time during
15  the term of supervised release, the Court may revoke the term of supervised release imposed on each
16  Count and require the defendant to serve up to 2 additional years imprisonment.

17              **VI.**    **SENTENCING DETERMINATION**

18      **A.**    **Statutory Authority.**

19      The defendant understands that the Court must consult the Federal Sentencing Guidelines and
20  must take them into account when determining a final sentence. The defendant understands that the
21  Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the
22  Sentencing Guidelines and must take them into account when determining a final sentence. The
23  defendant further understands that the Court will consider whether there is a basis for departure from the
24  guideline sentencing range (either above or below the guideline sentencing range) because there exists
25  an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into
26  consideration by the Sentencing Commission in formulating the Guidelines. The defendant further
27  understands that the Court, after consultation and consideration of the Sentencing Guidelines, must
28

PLEA AGREEMENT            10

impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

**B.    Stipulations Affecting Guideline Calculation.**

The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate to the following:

**(i)    Count One: 18 U.S.C. § 371—Conspiracy to Commit an Offense Against the United States and to Defraud the United States.**

1.    **Base Offense Level**: The base offense level for the charges to which the defendant is pleading guilty is **6**. See U.S.S.G. §§ 2X1.1(a); 2B1.1(a)(2).

2.    **Specific Offense Characteristics:**

a.    Thirty levels are added (**+30**) because the loss attributable to the defendant during the time period of his knowing involvement in the conspiracy and within the scope of his knowing involvement exceeded $550,000,000. U.S.S.G. § 2B1.1(b)(1)(P).

b.    Two levels are added (**+2**) because the offense involved 10 or more victims. Id. at (b)(2)(A).

c.    Two levels are added (**+2**) because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. Id. at (b)(10)(C).

d.    No three level reduction, under U.S.S.G. § 2X1.1(b)(2), is required because the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense.

3.    **Preliminary Offense Level**: The parties anticipate that the preliminary offense level will be **40**.

4.    **Chapter Three Adjustments**:

a.    The parties disagree about whether two levels should be added because the defendant was an organizer, leader, manager, or supervisor in any criminal activity, pursuant to U.S.S.G. § 3B1.1.  Accordingly, the parties reserve the right to argue to the Court the proper application of U.S.S.G. § 3B1.1, as set forth below:

The government will argue that two levels are added (**+2**) because the defendant was an organizer, leader, manager, or supervisor in any criminal activity pursuant to § 3B1.1(c).  The defendant may argue that he was not an organizer, leader, manager, or supervisor in any criminal activity and no role adjustment is applicable under § 3B1.1.

b.    Two levels are added (**+2**) because the defendant abused a position of private trust in a manner that significantly facilitated the commission or concealment of the offense. U.S.S.G. § 3B1.3.

PLEA AGREEMENT                                                    11

**5. Adjusted Offense Level:** Given the stipulations above, if the Court agrees with the United States concerning application of U.S.S.G. § 3B1.1, the specific offense level will be **44**. If the Court agrees with the defendant concerning application of U.S.S.G. § 3B1.1, the specific offense level will be **42**.

### (ii) Count Two: 15 U.S.C. §§ 77q(a) and 77x—Securities Fraud.

**1. Base Offense Level:** The base offense level for the charges to which the defendant is pleading guilty is **6**. See U.S.S.G. § 2B1.1(a)(2).

**2. Specific Offense Characteristics:**

a. Thirty levels are added (**+30**) because the loss attributable to the defendant during the time period of his knowing involvement in the scheme and within the scope of his knowing involvement exceeded $550,000,000. U.S.S.G. § 2B1.1(b)(1)(P).

b. Two levels are added (**+2**) because the offense involved 10 or more victims. Id. at (b)(2)(A).

c. Two levels are added (**+2**) because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. Id. at (b)(10)(C).

**3. Preliminary Offense Level:** The parties anticipate that the preliminary offense level will be **40**.

**4. Chapter Three Adjustments:**

a. The parties disagree about whether two levels should be added because the defendant was an organizer, leader, manager, or supervisor in any criminal activity, pursuant to U.S.S.G. § 3B1.1. Accordingly, the parties reserve the right to argue to the Court the proper application of U.S.S.G. § 3B1.1, as set forth below:

The government will argue that two levels are added (**+2**) because the defendant was an organizer, leader, manager, or supervisor in any criminal activity pursuant to § 3B1.1(c). The defendant may argue that he was not an organizer, leader, manager, or supervisor in any criminal activity and no role adjustment is applicable under § 3B1.1.

b. Two levels are added (**+2**) because the defendant abused a position of private trust in a manner that significantly facilitated the commission or concealment of the offense. U.S.S.G. § 3B1.3.

**5. Adjusted Offense Level:** Given the stipulations above, if the Court agrees with the United States concerning application of U.S.S.G. § 3B1.1, the specific offense level will be **44**. If the

Court agrees with the defendant concerning application of U.S.S.G. § 3B1.1, the specific offense level will be **42**.

### (iii)Count Three: 15 U.S.C. §§ 77q(a) and 77x—Securities Fraud.

1. **Base Offense Level**: The base offense level for the charges to which the defendant is pleading guilty is **6**. See U.S.S.G. § 2B1.1(a)(2).

2. **Specific Offense Characteristics:**

   a. Thirty levels are added (**+30**) because the loss attributable to the defendant during the time period of his knowing involvement in the scheme and within the scope of his knowing involvement exceeded $550,000,000. U.S.S.G. § 2B1.1(b)(1)(P).

   b. Two levels are added (**+2**) because the offense involved 10 or more victims. Id. at (b)(2)(A).

   c. Two levels are added (**+2**) because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. Id. at (b)(10)(C).

3. **Preliminary Offense Level:** The parties anticipate that the preliminary offense level will be **40**.

4. **Chapter Three Adjustments**:

   a. The parties disagree about whether two levels should be added because the defendant was an organizer, leader, manager, or supervisor in any criminal activity, pursuant to U.S.S.G. § 3B1.1. Accordingly, the parties reserve the right to argue to the Court the proper application of U.S.S.G. § 3B1.1, as set forth below:

   The government will argue that two levels are added (**+2**) because the defendant was an organizer, leader, manager, or supervisor in any criminal activity pursuant to § 3B1.1(c). The defendant may argue that he was not an organizer, leader, manager, or supervisor in any criminal activity and no role adjustment is applicable under § 3B1.1.

   b. Two levels are added (**+2**) because the defendant abused a position of private trust in a manner that significantly facilitated the commission or concealment of the offense. U.S.S.G. § 3B1.3.

5. **Adjusted Offense Level:** Given the stipulations above, if the Court agrees with the United States concerning application of U.S.S.G. § 3B1.1, the specific offense level will be **44**. If the Court agrees with the defendant concerning application of U.S.S.G. § 3B1.1, the specific offense level will be **42**.

**6. Grouping Multiple Counts:**

    a.  The Counts in the Information to which the defendant is pleading guilty may be grouped together under U.S.S.G. § 3D1.2(d).

    b.  The offense level applicable to the grouped Counts is either **42** or **44** (depending on the Court's determination concerning the application of U.S.S.G. § 3B1.1), which is the offense level corresponding to the aggregate quantity of loss, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three of the Sentencing Guidelines. See U.S.S.G. § 3D1.3(b).

    c.  Three levels are subtracted **(-3)** if the defendant pleads guilty, accepts responsibility for his offense, and the Specific Offense Level is above 16. U.S.S.G. § 3E1.1; see also Part III.B.2 above.

**2. Adjusted Offense Level:** Given the stipulations above, the parties anticipate that the adjusted offense level will be either **39** or **41** (depending on the Court's determination concerning the application of U.S.S.G. § 3B1.1).

**3. Criminal History:** The parties agree and stipulate that the applicable criminal history will be determined by the Court's probation officers. The parties estimate but do not stipulate that the defendant's criminal history category will be I, and that the Guidelines sentencing range will be no less than **262 to 327** months in prison if the Court finds that the Adjusted Offense Level is 39, or **324 to 405** months in prison if the Court finds that the Adjusted Offense Level is 41. In any event, the parties agree that the sentence range will be subject to the maximum statutory sentence possible for the offenses of conviction. The defendant understands that if his criminal history category differs from the parties' estimate, his Guidelines sentencing range may differ from that set forth here.

**C.   Departures or Other Enhancements or Reductions.**

The parties agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"), or cross-references, except that the government may move for a departure or an adjustment based on the defendant's cooperation (§5K1.1) or post-plea obstruction of justice (§3C1.1). Both parties agree not to move for, or argue in support of, any departure from the Sentencing Guidelines, or any deviance or variance from the Sentencing Guidelines under United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005).

The defendant also agrees that the application of the United States Sentencing Guidelines to his case results in a reasonable sentence and that the defendant will not request that the Court apply the sentencing factors under 18 U.S.C. § 3553 to arrive at a different sentence than that called for under the Sentencing Guidelines' advisory guideline range as determined by the Court. The defendant acknowledges that if the defendant requests or suggests in any manner a different sentence than what is called for under the advisory guideline range as determined by the Court, that will be considered a violation of the Plea Agreement. The government's remedies and remaining obligations in this Agreement shall be as outlined in paragraph II.E, above.

Notwithstanding the above, at sentencing, the defendant may argue, under 18 U.S.C. § 3553(a) and U.S.S.G. § 5G1.2 only, in support of the imposition of concurrent sentences on Counts Two and Three only. That is, the defendant agrees not to argue that the total punishment required under U.S.S.G. § 5G1.2, is less than 120 months, before application of any reduction recommended by the government pursuant to any motion under U.S.S.G. § 5K1.1. The government may oppose any such argument and argue that the total punishment required under U.S.S.G. § 5G1.2 is 180 months, before application of any reduction recommended by the government pursuant to any motion under U.S.S.G. § 5K1.1.

## VII.   WAIVERS

### A.   Waiver of Constitutional Rights.

The defendant understands that by pleading guilty he is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to testify on his behalf; (f) to confront and cross-examine witnesses against him; and (g) not to be compelled to incriminate himself.

### B.   Waiver of Appeal and Collateral Attack.

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence. The defendant agrees as part of his plea, however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not

PLEA AGREEMENT                                15

exceed the statutory maximum for the offenses to which he is pleading guilty, including if the Court imposes consecutive terms on Counts One through Three. The defendant understands that this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which the defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts attached to this Agreement is insufficient to support the defendant's plea of guilty. The defendant specifically gives up the right to appeal any order of restitution the Court may impose.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum for all Counts; and/or (2) the government appeals the sentence in the case. The defendant understands that these circumstances occur infrequently and that in almost all cases this Agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of the counts to which he is pleading guilty, the government shall have the rights set forth in Section II.E herein.

**C.** **Waiver of Attorneys' Fees and Costs.**

The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed pursuant to this Plea Agreement and any charges previously dismissed).

**D.** **Impact of Plea on Defendant's Immigration Status.**

The defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes

1 | are removable offenses, including offenses to which the defendant is pleading guilty. The defendant and
2 | his counsel have discussed the fact that the charges to which the defendant is pleading guilty is an
3 | aggravated felony, or a crime that is likely to be determined to be an aggravated felony under 8 U.S.C. §
4 | 1101(a)(43), and that while there may be arguments that the defendant can raise in immigration
5 | proceedings to avoid or delay removal, it is virtually certain that the defendant will be removed.
6 | Removal and other immigration consequences are the subject of a separate proceeding, however, and the
7 | defendant understands that no one, including his attorney or the district court, can predict to a certainty
8 | the effect of his conviction on his immigration status. The defendant nevertheless affirms that he wants
9 | to plead guilty regardless of any immigration consequences that his plea may entail, even if the
10 | consequence is his automatic removal from the United States.

11 |

## VIII.    ENTIRE PLEA AGREEMENT

12 | Other than this Plea Agreement, no agreement, understanding, promise, or condition between the
13 | government and the defendant exists, nor will such agreement, understanding, promise, or condition
14 | exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and
15 | counsel for the United States.

16 | ///
17 | ///
18 | ///
19 | ///
20 | ///
21 | ///
22 | ///
23 | ///
24 | ///
25 | ///
26 | ///
27 | ///
28 | ///

## IX.   APPROVALS AND SIGNATURES

### A.   Defense Counsel.

I have read this Plea Agreement and have discussed it fully with my client. The Plea Agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this Plea Agreement.

Dated:

_____
MILES EHRLICH
Attorney for Defendant

### B.   Defendant:

I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this Plea Agreement. In addition, no one has threatened or forced me in any way to enter into this Plea Agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated:

_____
ROBERT A. KARMANN
Defendant

### C.   Attorney for United States:

I accept and agree to this Plea Agreement on behalf of the government.

Dated:                                          McGREGOR W. SCOTT
                                                United States Attorney


_____
ANDRÉ M. ESPINOSA
Assistant United States Attorney

EXHIBIT "A"
Factual Basis for Plea

I.     **Background**

A.     **The conspirators operate a $2.5 billion Ponzi scheme causing $1 billion in loss.**

From December 2009 through January 2019, Individual 1 and Individual 2, husband and wife, owned and operated two closely related business entities, Company S and Company D (collectively "the Company"). During nearly all of that period, the Company operated a Ponzi scheme that defrauded investors of approximately $1 billion through material misrepresentations and omissions related to the offer and sale of investments designed to generate profit and trigger significant tax benefits for investors. Between approximately 2016 and February 2019, the headquarters for the Company was located in Benicia, California, in the Eastern District of California. Defendant, Robert A. Karmann, was a certified public accountant and began working with the Company in approximately August 2014.

B.     **The Company sells MSGs to generate profit and to trigger tax benefits.**

Directly and through subcontractors, the Company built mobile solar generators ("MSGs"), consisting primarily of solar panels placed on a wheeled-trailer. Company D purported to lease those MSGs to third parties, including negotiating lease agreements and collecting payments. Individual 1 and others acting at his direction touted the versatility of MSGs, and claimed there was a substantial market demand for MSGs.

The Company, through Individual 1, his co-conspirators, and others acting at their direction, solicited money from investors to purchase MSGs. A primary claim made to investors was that the purchase of MSGs carried favorable tax consequences in addition to a profit stream. The tax benefits included tax credits available for investment in alternative energy sources that permitted purchasers to claim tax credits of up to 30% of the total investment, and permitted deductions for the depreciation of MSGs over a 5-year period. These tax benefits were significant.

The Company structured transactions with investors to maximize the tax benefits. Among other deals, the Company sold MSGs to limited liability companies created specifically for such transactions. These companies were investment funds, sometimes called tax-equity funds, permitted under the federal tax code ("Funds").

C.     **Transaction financing structure and the materiality of promised lease revenue.**

Through the Funds, investors purchased MSGs from Company S for $150,000 per MSG. Typically, investors paid approximately $45,000 per MSG in cash—approximately 30% of the overall unit price—and financed the balance with Company S. The $45,000-per-unit price was the maximum amount of the tax credit investors could claim per unit. The transactions were structured so investors could immediately claim a dollar-for-dollar tax credit for the total they paid in cash to Company S, per MSG. Investors could also claim depreciation for each MSG, for five years. To complete the transactions, the Funds delivered promissory notes to pay Company S the remaining approximately 70% of the sales prices over time. The Company promised to pay off the investors' note obligations with revenues generated by the lease of MSGs by Company D to third parties.

Pursuant to offers pitched to investors by Individual 1, his co-conspirators, and others acting at their direction, the Funds leased the MSGs purchased in each transaction to Company D, which purported to lease the MSGs to third parties. Company D was supposed to receive money from those third parties through lease payments. After deducting certain fees, Company D was to transfer the majority of the lease revenue to accounts for the Funds. The manager of the investment funds was to use the lease revenue sent by Company D to pay the periodic obligations on the notes held by Company S, with a small monthly profit paid to investors.[1]

The purported lease revenue from third parties was a material component of the transactions. First, that projected lease revenue was a factor in valuing the MSGs at $150,000 per unit. Second, the lease revenue was the mechanism for the Funds to pay the remaining approximately 70% of the purchase price for the MSGs. Based on sales pitches by Individual 1, his co-conspirators, and others acting at his direction, investors were primarily interested in the tax benefits offered through each transaction and not actual ownership of the MSGs. However, because the tax credits were capped at 30% of the value of the overall transaction, paying anything more than 30% of that value would

---

[1] The Company also closed a variant of these tax-equity transactions that did not include financing through Company S. Rather, in those sale-leaseback transactions, investors purchased MSGs outright, or relied on outside financing. In other material respects, the transactions mirrored the primary tax-equity transactions, including the management of third-party lease contracts by Company D, availability of post-transaction tax benefits, and a profit stream. Instead of using third-party lease revenue to pay a note obligation to Company S, the purported revenue was paid to the investor.

1  diminish the tax benefits—*i.e.*, the investors would pay more than the value of the tax credits. By

2  paying off the 70% balance of the purchase price through revenue generated by leases Company D

3  promised to generate from third parties, investors maximized the tax benefits without incurring more

4  debt or cost. Failure of that mechanism after investors executed transactions would result in default on

5  the notes, collapse of the transactions, and failure of the tax credits.

6  **D.    Purportedly independent certification of the construction and operation of MSGs.**

7  Because the Company promised to lease MSGs associated with each transaction to third

8  parties—through Company D—with little direct participation from the Funds or investors, the Funds and

9  investors did not take physical possession of those MSGs. Rather, the Company represented to the

10  Funds and investors that it built MSGs for each transaction and those MSGs operated in a manner

11  consistent with regulations governing application of the tax credits the investors sought. The Company

12  made those representations through written Commissioning Reports, purportedly prepared by an

13  independent engineer after a multi-point inspection of each MSG in each transaction. Individual 1, his

14  co-conspirators, and others acting at their direction caused those Commissioning Reports to include

15  materially false information and to be delivered to investors. In some instances, investors required

16  completed Commissioning Reports as conditions for payment to support the transactions. In other

17  instances, Individual 1 and his co-conspirators delivered the Commissioning Reports after payment to

18  lull investors to believe their MSGs existed and operated as required under the terms of the transactions.

19  **E.    Approximate investments and tax benefit totals associated with the transactions.**

20  Between March 2011 and December 18, 2019, at least twelve investors entered into transactions

21  with the Company through approximately thirty-four Funds. Some investors invested through more than

22  one Fund. The investors, through the Funds, collectively deposited by interstate wire transfer

23  approximately $759,000,000 into bank accounts for the Funds established for the transactions. Further,

24  several financial institutions and other investors transferred collectively $136,000,000 to the Company

25  as part of related transactions for the purchase and lease of MSGs. In total, the Company closed

26  transactions with Funds and others involving approximately 17,000 MSGs, at approximately $2.5 billion

27  in purported value.

28

PLEA AGREEMENT                              A-3

1   Many investors have claimed tax credits and depreciation in connection with the transactions
2   premised on the revenue allegedly being earned by Company D's leases of the MSGs to third parties.
3   Those investors include those invested through, among others: Fund, Fund 3, Fund 4, Fund 5, Fund 6,
4   Fund 7, Fund 8, Fund 10, Fund 11, Fund 12, Fund 14, Fund 15, Fund 16, Fund 17, Fund 18, Fund 19,
5   Fund 20, Fund 21, Fund 22, Fund 23, Fund 24, Fund 26, Fund 27, Fund 28, Fund 29, Fund 30, Fund 31,
6   Fund 32, USBDCS Fund 1, USBDCS Fund 2, Fund Holding 9.[2] The tax value of the tax credits and
7   depreciation claimed by the Funds, up to and including the 2017 tax year, is approximately
8   $902,000,000. This figure does not account for approximately $167,000,000 that investors paid into tax
9   equity transactions in 2018.

10   **F.    Operation of the "flip" deals that followed the tax equity transactions.**

11   The Company structured nearly all of the tax-equity transaction so the investors owned 99% of
12   the associated Fund and the fund manager owned 1% of the Fund. After five years, the ownership
13   structure flipped, with the fund manager owning 95% of the Fund and the investors owning 5%. After
14   five years, investors had the option of selling their 5% ownership interest in the Fund to the fund
15   manager, and divesting their ownership interest in the MSGs. This appealed to many investors because,
16   after five years, they could extract no further tax benefit from ownership of the MSGs.

17   At the end of a five-year term of a tax-equity transaction, the Company would arrange to sell
18   certain existing MSGs from those transactions to buyers in "flip" deals. In one such transaction,
19   Individual 1, his co-conspirators, and others acting at their direction brokered a "flip" deal with A-Group
20   and K Bank. As part of that transaction, K Bank provided $27 million to A Group, a private equity
21   group, to finance the purchase of approximately 416 MSGs that were owned by two Funds through
22   earlier tax-equity transactions. The $27 million from K Bank represented approximately 80% of the
23   overall transaction. A Group investors contributed the balance of the purchase price. The deal was
24   completed through a special purpose entity called S-Sense.

25   Individual 1, his conspirators, and others acting at their direction represented to A Group and K

26

27   [2] At the request of a party to the associated investment transaction, or a representative of that party, the IRS
assigned Employer Identifications Numbers ("EIN") to Funds 33 through 36. Certain of those Funds, including
28   Fund 33, closed transactions with the Company, however, none has filed Fund tax returns with the IRS claiming
tax benefits.

1  Bank that the 416 MSGs were leased to Telecom Company A as part of an approximately 10-year fixed
2  amount contract between Telecom Company A and Company D. After the sale, S-Sense leased the
3  MSGs back to Company D to continue leasing them to Telecom Company A as part of the purported
4  existing contract between them. Thereafter, the Company assigned purported lease revenue generated
5  by that lease with Telecom Company A to S-Sense as a revenue and profit stream.

6         **G.     The Company's tax equity transactions were fraudulent.**

7         Bank records, witness interviews, and other evidence, revealed that Individual 1 and his co-
8  conspirators knowingly misrepresented the existence of lease revenue from third parties—an integral
9  component in all of the Company's transactions—and caused others to unwittingly do so. In particular,
10  the conspirators claimed Company D generated tens of millions of dollars in lease revenue from third
11  parties leases, from long-term and short-term agreements with third parties.

12         In truth, Individual 1 and his co-conspirators operated the Company as a massive Ponzi scheme.
13  Over 90% of the money Company D claimed as lease revenue and which it used to pay the Funds' note
14  obligations and other payments to investors was actually derived from transfers of cash contributed to
15  Company S by later investors in tax-equity and other transactions. Company S had nearly no other
16  significant sources of revenue. Company S was the primary source of income for Company D,
17  providing no less than approximately 94% of all of the purported revenue Company D claimed. Thus,
18  the Company merely paid obligations due to older investors with money raised from those investors and
19  later investors—contrary to representations to investors made by Individual 1, his co-conspirators, and
20  those acting at their direction, that third-party lease revenue would pay those obligations. Certain of
21  Company D's existing third-party lease agreements were supported with separate side-agreements
22  pursuant to which Company S paid investor money to third parties, which the third parties returned in
23  the form of lease revenue. The conspirators concealed the absence of third-party lease revenue from
24  investors through, among other means, false financial statements they knowingly shared with investors.

25         The defendant and many of his co-conspirators knew it was a violation of the tax laws to falsely
26  claim tax credits and depreciation. However, as part of the scheme, they intended for investors to claim
27  such tax benefits, to which they knew the investors were not entitled because of the false nature of the
28  supporting tax equity transactions and the false information they gave investors. That outcome was a

PLEA AGREEMENT                    A-5

1  goal of the scheme and a primary method by which the conspirators encouraged investments and

2  bolstered confidence in their false claims to investors.

3       **H.**    **The A Group/K Bank "flip" deal transaction was fraudulent.**

4       The A Group/K Bank "flip" was also a fraud.  Contrary to representation made by Individual 1,

5  his co-conspirators, and others acting at their direction, the purported fixed-term lease between Telecom

6  Company A and Company D that supported the transaction was false.  Rather, certain as-needed leases

7  with Telecom Company A generated only a fraction of the millions in annual revenue Individual 1 and

8  his co-conspirators claimed supported the A Group/K Bank deal.  The overwhelming majority of that

9  purported revenue derived from intercompany transfers of tax-equity investor money from Company S

10  to Company D.  In support of the transaction, and in furtherance of the fraud, Individual 5 knowingly

11  caused a fraudulent estoppel agreement to be delivered to A Group/K Bank in support of the transaction,

12  which purported to assign lease revenue to A Group/K Bank, when that lease agreement and the

13  purported revenue associated with it did not exist.

14       **I.**    **The December 2018 searches and asset seizures, the Company's bankruptcy, and**
15            **the MSG audit by investor-victims.**

16       In December 2018, law enforcement agents executed search warrants at the Company's

17  headquarters and elsewhere.  Agents also executed over 150 asset seizure warrants, resulting the seizure

18  of approximately $60,000,000 in assets derived from the fraud.  During execution of those warrants,

19  agents found approximately $1.7 million in cash in Individual 1's office safe and over $150,000 in cash

20  in other locations throughout the office suite.  Inside the chief financial executive's office, agents found

21  an investor presentation and marketing documents, as well as internal financials for Company D's

22  performance in November 2018 and December 2018.  Agents also interviewed employees, at least one

23  of whom provided information about the Company's structure and evidence of the ongoing fraud.

24       Following execution of those warrants, the Company entered bankruptcy in or about February

25  2019.  Thereafter, certain investor-victims financed an independent audit of the existence and location of

26  all MSGs based on information that the Company had not built the total number of MSGs it represented

27  to investors were part of the tax-equity transactions.  The audit produced evidence of the existence of

28  approximately only 6,000 MSGs from approximately 17,000 MSGs associated with sales to Funds in

1   approximately thirty-four tax-equity transactions. Among others, none of the approximately 2,280
2   MSGs associated with Fund 29, involving over $100,000,000 in cash paid by an investor in or about
3   May 2017, were located in the investor-victim audit. Additionally, only approximately eighty-three of
4   the 2,279 MSGs associated with Fund 33, involving more than $90,000,000 in cash paid by the same
5   investor in or about July 2018, were located in the investor-victim audit.

6   ## II.   Facts Describing Defendant's Involvement in the Scheme

7   ### A.   Karmann joined the conspirators' existing conspiracy to defraud investors.

8   Defendant Robert A. Karmann ("Karmann") knowingly joined the conspiracy to defraud the
9   Company's investors and the Internal Revenue Service ("IRS") and furthered it through overt acts to
10  mislead investors about material facts and cause them to pursue and accept tax benefits to which they
11  were not entitled. Karmann was a certified public accountant and worked at the Company first as its
12  Controller and, later, as its Chief Financial Officer ("CFO"). Before his employment with the Company,
13  Karmann worked for co-conspirator Ronald J. Roach ("Roach") at Roach's accounting practice, between
14  2013 and 2014, where Karmann assisted Roach with work for the Company, among other matters.

15  The conspiracy was underway by the time Karmann began working at the Company, in 2014.
16  Roach explained to Karmann the Company's accounting and bookkeeping, including the Ponzi-like
17  payments from Company S to Company D. Karmann initially viewed those intercompany transfers as
18  subsidies to cover shortfalls of a startup company. However, Karmann soon recognized that Company
19  D was earning virtually no third-party lease revenue to meet its obligations to the Funds. Karmann
20  became numb to Company D's failure, and rationalized it by concluding that so long as investors were
21  paid what they were owed, the investors were not being harmed. Between at least November 2015 and
22  early 2016, Karmann recognized that executives and others associated with the Company were making
23  false representations to investors and misleading investors about the Company's operation and
24  bookkeeping, including its reported revenue, causing investors to pursue through the Funds, tax benefits
25  from the IRS to which they were not entitled because of the false nature of the claimed revenue
26  supporting the transactions. Instead of revealing to investors Company D's failure to earn claimed third-
27  party lease revenue, Karmann joined the conspiracy and worked to conceal the fraud from investors.

28

PLEA AGREEMENT                          A-7

1    Among other duties, in his roles at the Company, Karmann was responsible for facilitating and
2    overseeing the intercompany transfers of funds from Company S to Company D, which he and other
3    conspirators fraudulently misrepresented to investors as third-party lease revenue. On multiple
4    occasions between 2016 through 2018, Karmann spoke to Individual 1, Individual 5, and Roach about
5    the unsustainability of the Ponzi-like transfers from Company S to support Company D. In those
6    conversations, Individual 1 and the others would put Karmann off and tell him "it's coming."
7    Nevertheless, between 2016 and December 18, 2018, month after month, Karmann facilitated or
8    oversaw the transfers of funds from Company S to Company D, which he knew he and his co-
9    conspirators were misrepresenting to investors as third-party revenue. Karmann also delivered and
10   caused to be delivered, to Roach, financial information for Company D, which both knew was false.
11   Roach used that false information to prepare tax returns and associated tax documents for certain of the
12   Funds, which those Funds used to pursue and obtain tax benefits to which they were not entitled. In
13   other limited instances, certain Funds prepared or had prepared tax returns and associated tax documents
14   without Roach's involvement but based on false financial information provided by or at the direction of
15   the conspirators.

16   Karmann also knew that audited financial statements for Company D, as opposed to compiled
17   financial statements, would reveal the absence of earned third-party lease revenue and expose the
18   intercompany transfers and the fraud. Whenever an investor or other party sought an audited financial
19   statement for Company D, Karmann discussed the request with Individual 1, who answered that they
20   would provide audited financial statements later, when Company D had sufficient revenue to support its
21   obligations. Individual 1 stated that when the Company finally provided audited financial statements for
22   Company D, investors would understand the Company did what it had to do to survive as a startup.
23   Acting to conceal and advance the fraud, on or about November 18, 2015, Karmann delivered complied
24   financial statements for Company D to an investor representative for multiple Funds knowing they
25   falsely represented transfers of money from Company S as third-party lease revenue earned by Company
26   D in 2014.

27   ///

28   ///

PLEA AGREEMENT                    A-8

**B.** **Individual 2 controlled external transfers of Company funds, including certain transfers from Company S to two third-party entities, which were structured to create the appearance of third-party lease revenue paid to Fund 9.**

While Karmann controlled internal Company transfers, he lacked authority to make external payments using Company funds. Instead, Individual 2 handled those external transfers. Among other such external transfers, Individual 2 managed transfers from the Company to two third-party entities, K-Systems and A-Rentals. Those entities were equipment management companies that purportedly leased more than 600 total MSGs purchased by investors in Fund 9.[3] Individual 1 arranged for the Company to pay K-Systems and A-Rentals periodic lease amounts each owed to investors in Fund 9, which K-Systems and A-Rentals paid as purported third-party lease revenue. Individual 1 stated that the Company agreed to pay the lease obligations as a favor because K-Systems and A-Rentals were unable to rent MSGs as expected. Individual 1 instructed Karmann not to disclose the arrangement to others.

**C.** **Karmann delivered false information about the location and lease revenue purportedly earned by MSGs sold to investors in Fund 6 and Fund 12.**

On several occasions in 2015 and 2016, Karmann knowingly and willfully delivered reports and other records to representatives of investors in Fund 6 and Fund 12 that contained affirmatively false information. Those deliveries were intended to conceal the conspirators' fraud and to lull investors in those Funds into the belief that MSGs they purchased were deployed in specific locations and earning third-party lease revenue, which was false in nearly every case. Specifically, on or about February 23, 2016, Karmann delivered by email written operation reports to investors in Fund 12, which falsely represented that MSGs sold to Fund 12 were leased to a third-party entity and earning income from that third-party entity during the second, third, and fourth quarters of 2015. On or about February 25, 2016, Karmann delivered by email written operation reports and summaries of mobile facilities to investors in Fund 6, which falsely represented that MSGs sold to Fund 6 were leased to a third-party entity and earning income from that third-party entity during the second, third, and fourth quarters of 2015. On or about May 13, 2016, Karmann delivered by email a written operation report and summary of mobile facilities to investors in Fund 6, which falsely represented that MSGs sold to Fund 6 were leased to a

---

[3] Unlike other transactions the Company completed, MSGs sold to Fund 9 were leased directly to third-party entities and not to Company D for sublease.

PLEA AGREEMENT                              A-9

1  third-party entity and earning income from that third-party entity during the first quarter of 2016.  In the

2  same email, Karamann also delivered a written operation report to investors in Fund 12, which falsely

3  represented that MSGs sold to Fund 12 were leased to a third-party entity and earning income from that

4  third-party entity during the first quarter of 2016.

5      Karmann also delivered other affirmatively false information to representatives of investors in

6  Fund 6 and Fund 12.  Specifically, on or about May 12, 2016, Karmann delivered by email to investors

7  in those Funds a written summary that asserted Company D earned sufficient excess rent from third-

8  party leases of MSGs owned by Fund 6 and Fund 12 to pay investors in those Funds a profit in 2015.  In

9  fact, no such excess rent was earned and no profit was due from such excess rent.

10  **D.  Karmann's conduct and that of his co-conspirators caused interstate wires.**

11      Karmann agrees that his conduct discussed herein, and that of his co-conspirators, caused

12  interstate wire communications, including the above-discussed emails, which Karmann agrees travelled

13  from his office in California to the office of a representative of Fund 6 and Fund 12 in Phoenix, Arizona.

14  Karmann also agrees his conduct and that of his co-conspirators caused interstate Fedwire deposits of

15  money from the investor-victim in the Fund 30 transaction, P Company, based in Ohio, to bank accounts

16  in California controlled by the Company, among others, as set forth below:

| Company Bank | Account No. | Date | Deposit Amount | Payor |
|---|---|---|---|---|
| H Bank | 5773XXX | 5/17/2017 | $15,063,692 | P Company |
| H Bank | 5773XXX | 7/20/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 8/24/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 8/29/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 9/25/2017 | $10,224,225 | P Company |

*I have read and carefully reviewed the Factual Basis for Plea with my attorney.  I agree that as it concerns my conduct it is correct.  I also agree that if this matter proceeded to trial, the United States could establish each of the facts contained within the Factual Basis for Plea beyond a reasonable doubt, and that those facts satisfy the elements of the offense to which I am pleading guilty.*

Dated: **12-11-19**

_____
ROBERT A. KARMANN
Defendant